# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

**GINA LAUDERDALE TERRY**                                                        **PLAINTIFF**

**V.**                                                         **NO. 3:16-CV-00013-DMB-RP**

**QUITMAN COUNTY SCHOOL DISTRICT**                                         **DEFENDANT**

## OPINION AND ORDER DENYING SUMMARY JUDGMENT

This employment discrimination action is before the Court on the motion for summary judgment filed by the Quitman County School District. Doc. #49.

## I
## Procedural History

On January 13, 2016, Gina Lauderdale Terry, a former fifth grade science teacher in the Quitman County School District, filed a complaint in this Court against the District. Doc. #1. In her complaint, Terry alleges claims for race discrimination and age discrimination. *Id*.

On January 25, 2017, the District filed a motion seeking summary judgment on all claims. Doc. #49. Terry responded to the motion for summary judgment on February 8, 2017. Doc. #51. The District filed a reply in support of its motion on February 15, 2017. Doc. #53.

## II
## Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is proper only when the record demonstrates that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Luv N' Care Ltd. v. Groupo Rimar*, 844 F.3d 442, 447 (5th Cir. 2016). "A factual issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party and material if its resolution could affect the outcome of the action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 226 (5th Cir. 2015) (internal quotation marks omitted). On a motion for summary judgment, a court must "consider the

evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Edwards v. Cont'l Cas. Co.*, 841 F.3d 360, 363 (5th Cir. 2016).

In seeking summary judgment, "[t]he moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (internal quotation marks and alterations omitted). If the moving party satisfies this burden, "the non-moving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). "Where the nonmoving party bears the burden of proof at trial, the moving party satisfies this initial burden by demonstrating an absence of evidence to support the nonmoving party's case." *Celtic Marine Corp. v. James C. Justice Cos., Inc.*, 760 F.3d 477, 481 (5th Cir. 2014).

## III
## Evidentiary Matters

In opposing summary judgment, Terry cites various statements allegedly made by Larry Johnson, the Dean of Students, to Terry and to teachers the District employed. The District objects to three of these statements as inadmissible hearsay. Doc. #53 at 2, 7.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as a "statement that ... the declarant does not make while testifying at the current trial or hearing [and] a party offers in evidence to prove the truth of the matter asserted in the statement." "Once a party has properly objected to evidence as inadmissible hearsay, the burden shifts to the proponent of the evidence to show, by a preponderance of the evidence, that the evidence falls within an exclusion or exception to the hearsay rule and was therefore admissible." *Loomis v. Starkville Miss. Pub. Sch. Dist.*, 150 F.Supp.3d 730, 742–43 (N.D. Miss. 2015) (internal quotation marks and alterations omitted).

2

"Unsubstantiated hearsay evidence that would not be admissible at trial does not suffice to raise a genuine issue of material fact." *Arora v. Starwood Hotels & Resorts Worldwide, Inc.*, 294 Fed. App'x 159, 161 (5th Cir. 2008) (citing *Clary v. Computer Assocs. Int'l., Inc.*, 109 F.3d 765, 765 (5th Cir. 1997)).

Here, the District objects to the following alleged statements attributed by Terry to Johnson: (1) that Terry and another employee needed to file a class action because of the way Nanette Reed, Terry's supervisor, treated white teachers; (2) that Reed became upset with Johnson after Johnson convinced a white teacher, who Reed was trying to make quit, not to resign; and (3) that Reed was mistreating another teacher because the teacher was white. Doc. #53 at 2, 7. These are clearly out of court statements introduced for the truth of the matter asserted. Terry did not respond to the District's objections to their admissibility. Accordingly, Terry has failed to meet her burden of showing that the statements fall within an exclusion or exception to the hearsay rule.[1] Therefore, these statements will not be considered for the purpose of resolving the motion for summary judgment.

## IV
## Factual Background

### A. Terry's Education and Work History

Terry is a Caucasian female who was 56 years old during the time period relevant to this action. Doc. #52-1. In 1997, Terry obtained a certification in elementary education at Athens State College in Alabama. Doc. #51-3. In 1989, she received a Bachelor's degree in secondary

---

[1] In response to a motion in limine filed by the District addressing the same statements, Terry argues that the statements: (1) are not hearsay because they are admissions of a party opponent; and (2) fall under the residual hearsay exception. Doc. #58. Beyond not responding to the District's objections to the summary judgment evidence, these arguments must fail. An admission of a party's employee is only admissible if it is "on a matter within the scope of [the employment] relationship." Fed. R. Evid. 801(d)(2)(D). More, to qualify for the residual hearsay exception, "[t]he proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force." *United States v. Phillips*, 219 F.3d 404, 419 n.23 (5th Cir. 2000). Terry's response to the motion in limine offers no argument how any of the three challenged statements, which relate to Reed's treatment of white *teachers*, may be considered matters within the scope of Johnson's employment as dean of *students*. The response also fails to identify any indicia of trustworthiness of any of the statements.

education in social sciences from Athens State; and in 2002, received a certification in special education from the University of Mississippi. *Id*.

In 1990, Terry began her teaching career with the Winfield Board of Education, working at the Northwest Community College campus and then the Bevill State Community College in Northwest Alabama. Doc. #51-2 at 16–20; Doc. #51-3. Terry later worked as a teacher in various locations, including Tupelo, Aberdeen, Lafayette County, and Desoto County in Mississippi, and in Shelby County, Alabama. Doc. #51-3.

### B. The District's Hiring of Terry

In the summer of 2014, Terry completed an online application for a teaching position in the State of Mississippi. Doc. #51-2 at 56–57. Sometime later, the District contacted Terry to set up an interview with Principal Nanette Reed and Curriculum and Instructional Director Linder Howze, the overseer of teacher recruitment. Doc. #51-2 at 58–59; Doc. #49-2 at 7–8; Doc. #49-3 at ¶ 2.

During the interview, Terry taught a mock lesson. Doc. #49-2 at 9. According to Howze, when Terry was "asked how to prepare a lesson and assess the needs of the students, she was unable to answer the question." Doc. #49-3 at ¶4. Howze further testified that Terry was "totally off key," did not "know[] her subject matter," and raised "concern[s]" because the school district's performance level was an F. Doc. #49-2 at 9–11. Because of Terry's "poor performance during the job interview [and] frequently changing jobs," Howze thought Terry "would not be a good fit for the District and that she should not be hired." Doc. #49-3 at ¶ 5. Even though Howze expressed her concerns to Reed, Reed offered Terry a position teaching fifth grade science. Doc. #51-2 at 63; Doc. #49-2 at 10; Doc. #49-3 at ¶ 5. Terry accepted on the spot. Doc. #51-2 at 63–64.

After the interview, Reed recommended Terry to the superintendent, who in turn

4

recommended Terry to the school board. Doc. #53-4 at 15–16; Doc. #49 at 27.

### C. Terry's Alleged Work Deficiencies

Reed had told all District teachers not to be on their cell phones during instructional time. Doc. #49-5 at 29. However, Reed testified that she saw Terry on the phone "about three times" the first week of school. *Id.* at 30. After speaking with Terry several times about being on the phone, Reed sent Terry an e-mail regarding her cellular phone use. *Id.*

In early September 2014, Reed conducted an unannounced evaluation of Terry. Doc. #51-2 at 97. Following her observation of Terry, Reed told Terry that she did not like the fact that the kids in her class were running around, and did not like the way Terry was teaching the class. *Id.* at 97–98.

About two weeks later, on September 16, 2014, during a routine observation of Terry's classroom, Reed saw Terry talking on a cell phone, Terry not teaching the objective listed on her lesson plan for that day, and students running around and talking while Terry was talking. Doc. #49-5 at 35–36. Specifically, Reed witnessed Terry "not teaching the standard" or "preparing the lesson to one standard and then teaching something else in the classroom." *Id.* at 32–33. For example, Reed observed Terry teaching "kinetic energy" when she was "supposed to have been doing objections in motion" according to her planned lesson. *Id.* at 33. Based on these observations, Reed believed no learning was occurring in Terry's classroom. *Id.* at 35.

### D. Letter of Reprimand and Terry's Resignation

Following the September 16 observation, Reed drafted a letter addressed to Terry entitled "Poor Job Performance." Doc. #49-6. In the letter, Reed told Terry, among other things: (1) she was "deeply disturbed to see you on your cell phone (again) during instruction time;" (2) "the students were running amuck;" (3) the "[i]nformation on board and your instructional delivery were not what you indicated in the lesson plan for today;" (4) despite being taught by "Mrs.

5

Presley, Instructional Coach," "you have chosen not to adhere to her recommendations for effective instructional delivery;" (5) "your instructional delivery does not align to the Madeline Hunter Effective Teaching Model that you are required to follow;" and (6) "students were beating on the desk, talking while you're talking, throwing paper across the room, and walking around the classroom. You did not attempt to redirect the students' negative behavior." *Id.* The letter ended by stating:

> You are NOT to talk on your cell phone during instructional time. You are to adhere to Madeline Hunter's Effective Teaching Model. In addition, you are to adhere to the lesson plans that includes [sic] the strategies/recommendations of the instructional coach then teach what's planned.
>
> Our students deserve the BEST and you are expected to give them YOUR VERY BEST!!!

*Id*.

At the end of the school day, Reed met with Terry. Doc. #49-5 at 36. According to Terry, Reed "started ranting and telling me that I was just wanting free money," stating Terry was "just freeloading and not trying to teach the kids." Doc. #51-2 at 102–03. Reed wrote the word "insubordination" down and said, "you're not doing your lesson plans and … you are being insubordinate." *Id.* Terry responded, "no ma'am, I'm not" and "I am needing your help on this," explaining to Reed that she had taught her lesson for the day. *Id.* at 103–05. During the meeting Terry asked for help from Chawonea Presley, the curriculum instructor, who was also present. *Id*. Reed responded, "You're not going to get [Presley] to help you. And she looked at [Presley] and said, do not help her at all. She's old enough she ought to know what all this stuff's about." Doc. #51-2 at 86. Reed denies telling Presley not to help Terry. Doc. #49-5 at 33.

When Terry asked Reed what she should do, Terry contends Reed responded, "there's two things you can do[,] you can write your resignation or I can fire you," repeating such two to three times. Doc. #51-2at 106. When Terry asked again if there was anything she could do, Reed said

6

"no," and told Terry not to come to school tomorrow. *Id.* at 106–07. By Terry's account, the meeting took about an hour. *Id.* at 106.

According to Reed, Terry admitted that she was unprepared for class, the students were all over the place, and she did not teach what was outlined on her lesson plan. Doc. #49-5 at 36. Reed told her that "I'm not going to allow you to continue [] to talk on your cell phone. That's a major, major problem." *Id*. at 37. Reed testified she told Terry that "if she didn't get her act together that she was going to be put on an improvement plan and she probably won't make it to the next school term." *Id*. at 20.

The following day, Terry submitted a resignation letter stating, in part, "I regret that due to circumstances beyond my control, I need to resign immediately." Doc. #51-8. The same day, Terry submitted a resignation letter to Superintendent Brenda Hopson, which stated in part, "I apologize for this inconvenience but it was not a decision that was made by me." Doc. #51-9. Terry explained that she wanted Hopson to know that the decision to leave was not Terry's. Doc. #51-2 at 143. Reed denies that she forced Terry to resign. Doc. #51-16 at 20–21.

### E. Terry's Denial of Work Deficiencies

According to Terry, she performed her job as a teacher satisfactorily during her employment at the District, had a good relationship with her students and their parents, and got along with other teachers. Doc. #51-2 at 76, 80.

During Reed's unannounced observation, Terry claims she was teaching science to students who "had never had science before." *Id.* at 97–98. Reed "acted like the kids didn't know what they were doing" but Terry explained they "did have to have some instruction because they had never done that before." *Id.* Following the evaluation, Reed met with Terry and gave her a copy of the Madeline Hunter lesson plan and told Terry that she had to make sure she filled it out and gave it to her. *Id.* at 99; Doc. #51-5. When Terry told Reed she would seek help from

7

Presley, Reed told Terry, "Ms. Presley [is] not going to help [you] because [you have] been a teacher a long time and [don't] need any help." Doc. #51-2 at 101–02. Terry would complete her lesson plan and e-mail it to Reed weekly. *Id*. at 99; *e.g.,* Doc. #51-6. Terry "tried to adhere [to the lesson plan] as best [she] could" and obtained Presley's assistance with the lesson plans. Doc. #51-2 at 62, 76–77, 99–100.

Terry denies each allegation in Reed's letter of reprimand. She denies that she violated the school's cell phone policy. Terry also denies students were beating on the desk, talking over her, throwing paper, and walking around the classroom when they were not supposed to be, as "she never saw them do this," "didn't know anything about throwing paper across the room," and allowed the students to walk around and talk when they did experiments. *Id.* at 85–86.

In response to Reed's accusation that Terry was not teaching her lesson, Terry contends that she was at "the end of the lesson" she was supposed to teach because she had gone through the 60 questions, was "just trying to find something" so she added "one question [that] was not on [her] objective," and told the class, "you're going to see this again." *Id.* at 84–85.

### F. Replacement by Syreata Survillion

Terry was replaced by Syreata Survillion, a black female who was then thirty-two years old. Doc. #51-10 at 7–8. Survillion received her Bachelor's degree in 2013 and two years later obtained a master's degree in childhood education. *Id.* at 5–6. During her first year working for Reed, Survillion did not have any problems with Reed, though Reed told her she needed to make changes to her lesson plan to be in line with the curriculum. *Id.* at 8–9.

### G. Tennessee Department of Labor Finding

On October 2, 2014, Terry applied for unemployment benefits in Tennessee. In making a claim for benefits, Terry represented to the Tennessee Department of Labor and Workforce Development of Employment Security ("TDOL") that she "was given the ultimatum to resign or

8

be discharged." Doc. #51-11. In response to the TDOL's request to the District for separation information, the District responded that Terry "resigned." *Id.*

On October 16, 2014, the TDOL found that Terry "was discharged from most recent work" and "was given the ultimatum to resign or be discharged for not writing the lesson plans correctly." Doc. #51-12. The TDOC noted that "[t]here is no evidence of previous warnings or progressive disciplinary action." *Id.*

### H. EEOC Charge

On June 9, 2015, Terry filed a Charge of Discrimination with the Equal Employment Opportunity Commission, in which she alleged:

> On or about September 2014, I was given two options by Dr. Reed (African American) to either resign or be terminated, for allegedly failing to follow her lesson plan and for in-subordination. I had no other option but to resign. Dr. Reed would constantly scrutinize the white teachers' teaching styles and strictly enforce her lesson plans on the white teachers and not the African American teachers.
>
> I believe that I was discriminated against based on my age (56) and race (Caucasian) in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act of 1967.

Doc. #51-1.

The EEOC issued Terry a Notice of Right to Sue on October 29, 2015. Doc. #1-2. Terry filed this action on January 13, 2016. Doc. #1.

## V
## Race Discrimination Claims

Terry's complaint asserts claims "arising under Title VII of the Civil Rights Act of 1964, as amended in 1991, under 42 U.S.C. § 1981 and under the Equal Protection Clause of the Fourteenth Amendment to the United States Action." *Id.* at ¶ 3. Terry alleges that "this action is authorized by 42 U.S.C. § 1983." *Id.*

"Title VII prohibits discrimination 'because of' a protected characteristic, including race." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016) (quoting 42 U.S.C.

9

§ 2000e-2(a)(1)). Both 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment prohibit state employers from discriminating against employees on the basis of race. *See Blackwell v. Laque*, 275 F. App'x 363, 367 (5th Cir. 2008) ("It was clearly established that the Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination [in employment]."); 42 U.S.C. § 1981(a) (prohibiting racial discrimination in "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship").

Claims based on violations of § 1981 or the Equal Protection Clause may be brought alongside a Title VII claim but must be asserted through the vehicle of § 1983. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 341 n.16 (5th Cir. 2002) ("§ 1981 does not provide a remedial cause of action against local government entities ...."); *Burns-Toole v. Byrne*, 11 F.3d 1270, 1273 n.3 (5th Cir. 1994) ("The district judge properly dismissed her First and Fourteenth Amendment claims as well, citing the rule that the proper vehicle for these allegations is § 1983."); *Evans v. City of Houston*, 246 F.3d 344, 356 n.9 (5th Cir. 2001) (plaintiff may assert parallel Title VII and § 1983 claims). When such claims are premised on the same set of facts, a court evaluates all claims under the standard governing Title VII actions.[2] *See Irby v. Sullivan*, 737 F.2d 1418, 1431 (5th Cir. 1984) ("[W]hen section 1983 is used as a parallel remedy with Title VII in a racial discrimination suit the elements of a cause of action are the same under both statutes.").

"A plaintiff may prove Title VII discrimination through direct evidence or circumstantial evidence." *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007). When a plaintiff lacks direct evidence of discrimination, she "may yet prevail … by providing

---

[2] Because the claims are evaluated under the same standard, courts have considered the merits of parallel claims, even when not expressly addressed in a defendant's motion. *See Coward v. Town and Village of Harrison*, 665 F.Supp.2d 281, 294 n.8 (S.D.N.Y. 2009) ("Defendants do not specifically address Plaintiff's Section 1983 equal protection claim, but it is fair to read Defendants' contention that Plaintiff cannot present any evidence that race was a factor in his arrest and subsequent exclusion from the park as an argument for dismissal of that claim.") (internal citation omitted).

circumstantial evidence sufficient to raise an inference of discrimination. In such cases, courts normally apply the *McDonnell Douglas* burden-shifting framework." *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (internal citations omitted). Under this framework:

> the plaintiff must first demonstrate a *prima facie* case, and then the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. If it does that, "the presumption of discrimination disappears." The plaintiff, who always has the ultimate burden, must then "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination."

*Outley*, 840 F.3d at 216 (internal citations omitted) (quoting *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011), and *Burton*, 798 F.3d at 233).

### A. Direct Evidence

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994) (finding statements that female plaintiff would never be worth as much as man direct evidence of subsequent sex discrimination). Here, Terry points to the statement she claims was made by the Dean of Students, Larry Johnson, that Terry and Crystal Joshlin needed to file a class action because white teachers were being subjected to reverse discrimination. The District argues that Johnson had no decision-making authority over Terry's employment and that the statement is hearsay.

As an initial matter, inadmissible hearsay statements necessarily do not qualify as direct evidence of discrimination to defeat summary judgment. *McNeil v. Metro*, 748 F.Supp.2d 1047, 1054 (E.D. Mo. 2010); *Wrobel v. Int'l Broth. of Elec. Workers, Local 17*, 638 F.Supp.2d 780, 787–88 (E.D. Mich. 2009). This Court has already found that the alleged statement is hearsay not

shown by Terry to fall within an exception or exclusion to the hearsay rule and, therefore, would not be considered in evaluating the instant motion. As hearsay, it may not be considered direct evidence.[3]

### B. Prima Facie Case

Generally, "[t]o establish a *prima facie* case, a plaintiff must demonstrate that he, (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014) (internal quotation marks omitted). In seeking summary judgment, the District challenges only Terry's ability to satisfy the third requirement. Doc. #50 at 8. Terry responds that she can satisfy the third requirement because she was forced to resign. Doc. #52 at 7–8, 16. The District denies that it forced Terry to resign.

An adverse employment action is an ultimate employment decision such as hiring, granting leave, discharging, promoting, or compensating. *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004). Where, as here, an employee resigns, the "resignation may still constitute an adverse employment action if the resignation qualifies as a constructive discharge." *Brown v. Liberty Mut. Grp., Inco.*, 616 F. App'x 654, 657 (5th Cir. 2015) (citing *Brown v. Kinney Shoe*

---

[3] Even if the statement was admissible, it still would not serve as direct evidence of discrimination. Where a plaintiff offers remarks as direct evidence, a four-part test is applied to determine whether they are sufficient to overcome summary judgment. "Remarks may serve as sufficient evidence of ... discrimination if the offered comments are: 1) [race] related; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (quoting *Brown v. CSC Logic, Inc*., 82 F.3d 651, 655 (5th Cir. 1996)). While *Reed* is an age discrimination case, the four-part test applies to race discrimination claims. *Brandon v. Sage Corp.*, 61 F.Supp.3d 632, 643 (W.D. Tex. 2014).

The summary judgment evidence establishes that as the Dean of Students at the middle school, Johnson is in charge of student discipline issues. Doc. #49-14 at 35–36. There is no indication Johnson had authority over the employment decision at issue. Without any evidentiary basis to infer that Johnson took part at a decision-making level concerning Terry's resignation, no reasonable jury could find Johnson had the authority to hire or fire Terry. Accordingly, his comments may not be considered direct evidence of discrimination.

*Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). Generally, "[a] constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 (5th Cir. 2001). However, a constructive discharge also occurs when an employee is told that he will be terminated if he does not resign. *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997); *Mendoza v. City of Palacios*, 962 F.Supp.2d 868, 872 (S.D. Tex. 2013) ("[A]n employee may also demonstrate constructive discharge if she resigns after the employer communicates that the employee will be fired.") (collecting cases).

Terry argues that because she "was given the ultimatum of either resigning or being terminated," her resignation was not voluntary. Doc. #52 at 16. She contends that after "about 15 or 20 minutes of [Reed] going on a tirade," Reed repeatedly "said that I needed to write a resignation or be fired." Doc. #51-2 at 106, 107. Beyond her own testimony that Reed gave her two choices, Terry points to the specific language in her two resignation letters, in which she stated that "the decision to resign was not made by her;" and the TDOL's determination that Terry was discharged.

First, a Tennessee "unemployment hearing officer's decisions should not be admitted in an employment discrimination suit." *Hill v. Shoe Show, Inc.*, No. 13-2931, 2015 WL 4527722, at *5 (W.D. Tenn. July 27, 2015). Additionally, the Court notes that, following her employment with the District, Terry filled out a job application stating that she had never been fired or asked to resign. Doc. #52-2 at 51–52. Nevertheless, viewing the evidence in the light most favorable to Terry, the Court finds that, given the District's denial that it forced Terry to resign, the evidence in the record creates a factual issue as to whether Terry was constructively discharged. Therefore, Terry has sustained her burden in demonstrating a genuine issue of material fact as to whether she suffered an adverse employment action such that summary judgment will not be granted on that

13

ground.

### C. Legitimate Nondiscriminatory Reason

Where, as here, a plaintiff satisfies her prima facie case based on a constructive discharge, the defendant must articulate a legitimate nondiscriminatory reason for the action (or actions) which "give rise to the[] constructive discharge." *Kiel v. Tex. Parks & Wildlife Dep't*, No. 1:14-cv-748, 2016 WL 7616532, at *4 (W.D. Tex. June 16, 2016); *see Davis v. Louisville Mun. Sch. Dist.*, No. 1:08-cv-249, 2010 WL 290956, at *10 (N.D. Miss. Jan. 15, 2010) (collecting cases). To this end, "the employer must produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action, apart from the inferred discriminatory reason." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016). At this step, the "burden is one of production, not persuasion ... as to its legitimate, nondiscriminatory reason." *Id*. To satisfy this burden, the employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the adverse employment action." *Id*. Such reason must be presented "with sufficient clarity to afford the employee a realistic opportunity to show that the reason is pretextual." *Burton*, 798 F.3d at 231 (quoting *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (internal quotation marks and emphasis omitted). While "the employer need not prove that it was actually motivated by its proffered reason," *Patrick*, 394 F.3d at 315; the proffered evidence must "give [a] reason for [the decision maker's] decisions at the time that he made those decisions," *Turner v. Kans. City S. Ry. Co.*, 675 F.3d 887, 904 (5th Cir. 2012).

The District argues that the deficiencies noted in Reed's September 16, 2014, evaluation of Terry's classroom qualify as legitimate nondiscriminatory reasons. Doc. #50 at 8–10. Terry responds that "Defendant claims Terry did not suffer an adverse employment decision, but instead, voluntarily resigned. Since that is their position, it can not argue that there was a legitimated [sic] non-discriminatory reason for the adverse employment decision." Doc. #52 at 16.

First, "Rule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses." *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016). Accordingly, the District is not per se prohibited from arguing that Reed did not terminate Terry but that even if she did, the termination would have been justified. The District, however, did not make the latter argument.

In the memorandum accompanying its motion for summary judgment, the District submits:

> As a result of what she witnessed, Dr. Reed gave Plaintiff a letter of reprimand and told her if her job performance did not improve she would place her on an improvement plan and she might not make it to the end of the year. Plaintiff voluntarily tendered her resignation the following day. Defendant has offered a legitimate, non-discriminatory reason for Dr. Reed's conduct toward Plaintiff.

Doc. #50 at 9–10 (internal footnotes omitted).

Thus, the District has offered a legitimate nondiscriminatory reason for Reed's letter of reprimand and Reed's threat to place Terry on a performance improvement plan. What the District has not done, however, is offer a legitimate nondiscriminatory reason for the action which forms the basis of Terry's constructive discharge—the alleged ultimatum that Terry resign or be fired.[4] In the absence of such an argument (or evidence),[5] the Court must conclude that the District has failed to sustain its step-two burden. Accordingly, the District's motion for summary judgment must be denied to the extent it seeks dismissal of Terry's race discrimination claims.[6]

---

[4] This is not to say that it is impossible for an employer to argue that an ultimatum was not given and to present evidence that, if the ultimatum was given, it was given for nondiscriminatory reasons. Rather, the Court merely finds that the summary judgment record does not support the presence of a nondiscriminatory reason here.

[5] Even had the District made such an argument, the submission would fail for lack of evidence. The District makes no effort to tie the allegations of misconduct to the act underlying the constructive discharge—Reed's alleged ultimatum that Terry must either resign or be fired. To the contrary, the undisputed evidence in the record shows that Reed, who testified that she planned on putting Terry on a performance improvement plan after the evaluation, *did not* believe the conduct observed on September 16 was sufficient to end Terry's employment. Accordingly, the record contains no evidence which would show a legitimate nondiscriminatory reason for Reed to have given an ultimatum. *See Turner*, 675 F.3d at 904 (employer failed to sustain step-two burden when it introduced letters alleging misconduct which did not "mention, nor give any reason, for [decisionmaker's] decision").

[6] Having reached this conclusion, the Court declines to address the District's pretext-related argument that it is entitled to a same-actor inference of no discrimination. *See Azar v. Benson Motor Co. of San Antonio, Inc.*, No. 14-CA-563, 2015 WL 12533100, at *4 (W.D. Tex. Mar. 19, 2015) ("The same-actor inference becomes relevant at the pretext stage.").

*See Patrick*, 394 F.3d at 320 ("[B]ecause Patrick has (1) established prima facie cases of discrimination and retaliation and (2) the INS has failed to satisfy its burden of producing a legitimate, nondiscriminatory reason for its employment decision, ... the INS's motion for summary judgment must be denied.").

# VI
# Age Discrimination Claims

The Age Discrimination in Employment Act ("ADEA") "prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Miller v. Raytheon Co.,* 716 F.3d 138, 144 (5th Cir. 2013). In the absence of direct evidence of discrimination,[7] the burden-shifting framework set forth in *McDonnell Douglas* applies to claims brought under the ADEA. *Id.*

### A. Prima Facie Case

To establish a prima facie case of discriminatory treatment based on age, plaintiffs must show: "1) they are within the protected class; 2) they are qualified for the position; 3) they suffered an adverse employment decision; and 4) they were replaced by someone younger or treated less favorably than similarly situated younger employees (*i.e.*, suffered from disparate treatment because of membership in the protected class)." *Leal v. McHugh*, 731 F.3d 405, 410–11 (5th Cir. 2013) (citation and internal quotation marks omitted). As with Terry's claims for race discrimination, the District challenges only Terry's ability to show she suffered an adverse employment decision.

The standard for an adverse employment decision is the same under the ADEA as it is for Title VII. *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995). Accordingly, for the reasons above, the Court concludes that, because there is a genuine issue of material fact as to whether Terry suffered a constructive discharge, she has satisfied her prima facie case for the

---
[7] Terry does not argue there is direct evidence of age discrimination.

purpose of summary judgment.

### B. Legitimate Nondiscriminatory Reason

In seeking summary judgment on Terry's age discrimination claims, the District offers the same reasons it did with regard to Terry's race discrimination claims. Doc. #50 at 16. For the identical reasons above, the Court concludes that the stated reasons do not satisfy the District's second-step burden. Therefore, summary judgment on Terry's age discrimination claim is inappropriate.

## VII
## Conclusion

For the reasons above, the District's motion for summary judgment [49] is **DENIED**.

**SO ORDERED**, this 5th day of June, 2017.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**